**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, and THE STATE OF NEW JERSEY ex rel. JENNIFER JEAN, | : : : | Case No.: |
| Plaintiff, | : : : | **FILED UNDER SEAL** |
| - against - | : : : | **JURY TRIAL DEMANDED** |
| FA CV CONSULTANTS PC, FADI EL-ATAT, and SARAH ABDUL-SATER, | : : : : | **SEALED** |
| Defendants. | : : | |

## COMPLAINT

Plaintiff-Relator Jennifer Jean ("Relator" or "Jean"), by and through her attorneys, Mahany Law and Brown, LLC, on behalf of the United States of America and the State of New Jersey, hereby alleges that Defendants, FA CV Consultants PC, Fadi El-Atat, and Sarah Abdul-Sater (collectively, "Defendants"), have violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*., and the New Jersey False Claims Act ("NJFCA"), N.J.S.A. §§ 2A:32C-1 *et seq*., by submitting false and fraudulent medical claims for reimbursement to various government health insurance programs, including Medicaid, Medicare, and TRICARE.

As described in more detail below, the Defendants ordered medical testing not for any valid medical purpose or to benefit and aid in their patients' treatment, but rather, ordered the tests simply in order to then submit claims for reimbursement to government

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

funded medical insurance programs, for no reason other than their own monetary gain. Such medical tests were ordered for all of Dr. El-Atat and Dr. Abdul-Sater's patients prior to either Dr. El-Atat or Dr. Abdul-Sater reviewing the patient's medical records and prior to either visiting with the patient to determine which tests, if any, were appropriate. The tests were effectively worthless, had no medical value, and were medically unnecessary. As further evidence of the worthless nature of these tests, Dr. El-Atat and Dr. Abdul-Sater would only rarely review test results. Because the tests were medically unnecessary, they were not reimbursable by Medicare, Medicaid, or TRICARE. Yet, despite the worthlessness of these unnecessary tests, Defendants submitted reimbursement claims for the tests which the government insurance programs paid.

As a result of their fraudulent claims and retention of fraudulently obtained government money, the Defendants are liable to the United States of America and the State of New Jersey.

## Parties

1.      Plaintiff the United States of America brings this action by and through Relator, Jennifer Jean. At all times relevant to this Complaint, the United States of America, acting through the Centers for Medicare & Medicaid Services ("CMS"), has reimbursed Defendants for the provision of various medical services and treatments for eligible individuals through the Medicare and Medicaid programs. Thus, the United States brings this action on behalf of its agencies, CMS and HHS, and on behalf of the Medicare and Medicaid programs.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

2.  Plaintiff the State of New Jersey brings this action by and through Relator, Jennifer Jean. New Jersey, through the Medicaid program that it funds together with the United States, has reimbursed Defendants for the provision of various medical services and treatments for eligible individuals through the Medicaid program.

3.  Relator Jennifer Jean is a resident of Essex County, New Jersey, and is a former employee of Defendant FA CV Consultants PC.

4.  FA CV Consultants PC ("FA CV") is a New Jersey Professional Corporation headquartered at 127 Pine Street, Suite 1, Montclair, NJ 07042. It is owned by Defendants Fadi El-Atat and Sarah Abdul-Sater. It operates a cardiology practice and currently has two locations: 127 Pine Street, Suite 1, Montclair, NJ and 1945 Morris Avenue, Suite 8, Union, NJ 07083.

5.  Defendant Fadi El-Atat is a New Jersey licensed cardiologist and owner of FA CV. Dr. El-Atat provides cardiology services at both of FA CV's locations.

6.  Defendant Sarah Abdul-Sater is a New Jersey licensed internal medicine physician who practices at both of FA CV's locations.

7.  Upon information and belief, Defendants El-Atat and Abdul-Sater are spouses.

## Jurisdiction and Venue

8.  This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 1367(a), and 31 U.S.C. § 3732.

9.  This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process in cases brought under the

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

False Claims Act, and because, *inter alia*, Defendants have offices in this District, have transacted business in this District, have engaged in wrongdoing in this District, and have at least minimum contacts with the District.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) because Defendants can be found in this District and transact business there, and the acts proscribed by 31 U.S.C. §§ 3729, *et seq.*, occurred there.

11.     Relator has standing to bring this action pursuant to 31 U.S.C. § 3730(b)(1).

### The Federal False Claims Act and the New Jersey False Claims Act

12.     The False Claims Act, 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (a) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (b) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

13.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

14.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

15.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

16.     A private citizen, such as Relator, can bring actions on the government's behalf. "A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government." 31 U.S.C. § 3730(b)(1).

17.     There has been no public disclosure under 31 U.S.C. § 3730(e) of the allegations or transactions in this Complaint with respect to which Relator is not an "original source," and all material information relevant to this Complaint was provided to the United States Government prior to filing this Complaint as required by 31 U.S.C. § 3730(e)(4)(B). Relator has direct and independent knowledge of the information on which the allegations are based. To the extent that any allegations herein have been

"publicly disclosed," Relator has knowledge that is independent of and materially adds to such publicly disclosed allegations.

18.     Similar to the federal FCA, New Jersey has enacted its own false claims act known as the New Jersey False Claims Act ("NJFCA").

19.     Pursuant to the NJFCA, a person is liable to the State of New Jersey if the person:

> a. Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval.
>
> b. Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;
>
> c. Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State; . . . or
>
> g. Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

N.J. Stat. Ann. § 2A:32C-3.

20.     For purposes of the NJFCA, the terms "knowing" and "knowingly" mean that a person, "with respect to information, (1) has actual knowledge of the information; or (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." N.J. Stat. Ann. § 2A:32C-2.

21.     Similar to the federal FCA, the NJFCA allows individuals, such as Relator, to bring actions on behalf of the State of New Jersey.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

### Medicare, Medicaid and TRICARE

22.     In 1965 Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for people age 65 or older; people under age 65 with certain disabilities; and people of any age with end-stage renal disease. Medicare is funded by the federal government.

23.     Medicare is administered through the United States Department of Health and Human Services and specifically, the Centers for Medicare and Medicaid Services.

24.     In its current iteration, the Medicare program consists of four parts, known as Parts A, B, C, and D. Generally speaking, Part A helps beneficiaries cover in-patient hospital costs; Part B helps beneficiaries cover doctor-administered medications and also provides coverage for outpatient care and medically necessary clinical diagnostic laboratory tests; Part C authorizes the creation of Medicare Advantage plans; and Part D helps beneficiaries cover the cost of self-administered prescription medications. Of these four, Part B is relevant here.

25.     To participate in Medicare, providers must assure that their services are provided economically, and only when (and to the extent they are) medically necessary. Medicare will reimburse costs only for medical services that are needed for the prevention, diagnosis, or treatment of a specific illness or injury.

26.     Providers such as Defendants enter into agreements with CMS to participate in the Medicare program. Such participating providers are entitled to seek reimbursement from CMS for services rendered to Medicare covered individuals.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

27.     To become an authorized Medicare Part B provider, a provider is required

to certify that:

> I agree to abide by the Medicare laws, regulations and program instructions
> that apply to this supplier. The Medicare laws, regulations, and program
> instructions are available through the Medicare contractor. I understand that
> payment of a claim by Medicare is conditioned upon the claim and the
> underlying transaction complying with such laws, regulations, and program
> instructions (including, but not limited to, the Federal anti-kickback statute
> and the Stark law), and on the supplier's compliance with all applicable
> conditions of participation in Medicare. Medicaid was created in 1965, at
> the same time as Medicare, when Title XIX was added to the Social
> Security Act. The Medicaid Program aids the states in furnishing medical
> assistance to eligible needy persons, including indigent and disabled
> people.

Medicare Enrollment Application: Clinics/Group Practices, CMS Form-855B, at

31 *available at* https://tinyurl.com/CMSForm855B (last accessed April 15, 2019).

28.     In order to receive reimbursement from Medicare or TRICARE,

participating providers submit claim forms. The form, CMS-1500, requires a provider

certification that:

> I certify that: 1) the information on this form is true, accurate and complete;
> 2) I have familiarized myself with all applicable laws, regulations, and
> program instructions . . . 4) this claim, whether submitted by me or on my
> behalf by . . . complies with all applicable Medicare and/or Medicaid laws,
> regulations, and program instructions for payment . . . 5) the services on
> this form were medically necessary.

Form CMS-1500, *available at* https://tinyurl.com/CMSForm1500 (last accessed April 15,

2019).

29.     Medicaid is a cooperative federal-state public assistance program

administered by the states. The New Jersey Medical Assistance and Health Services

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

Program ("New Jersey Medicaid") is administered by the New Jersey Department of Human Services (NJDHS), and specifically by the Division of Medical Assistance and Health Services (DMAHS), an agency of NJDHS.

30. Funding for Medicaid is shared by the federal government and New Jersey.

31. Defendants are approved providers in the New Jersey Medicaid program. Similar to Medicare, Medicaid reimburses only medically necessary and reasonable services. New Jersey Medicaid requires that providers use Form CMS-1500, which requires providers to certify "that the services listed above [on the claim form] were medically indicated and necessary to the health of this patient."

32. Both Medicaid and Medicare reimburse only for services that are medically reasonable and necessary. *See* 42 USC 1395y(a)(1)(A); 42 USC 1320c-5(a)(1). Furthermore, 42 CFR § 411.15(k)(1) provides that "tests not ordered by the physician or other qualified non-physician provider who is treating the patient are not reasonable and necessary."

33. N.J.S.A. § 30:4D-17 establishes liability for any provider that fraudulently submits claims to New Jersey Medicaid for payment.

34. In addition to the general requirements that testing be medically reasonable and necessary, additional rules apply to various tests referenced in this Complaint. For example, electrocardiograms (EKGs) are not covered when offered as a screening test or as part of a routine examination (except when performed as part of the "Welcome to Medicare" examination). *See* Medicare National Coverage Determinations Manual,

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

Chapter 1, Part 1, § 20.15 – Electrocardiographic Services, *available at* https://tinyurl.com/1NCDGuidanceEKG (last accessed April 16, 2019).

35. Some of the tests that Defendants performed are subject to Medicare Local Coverage Determinations ("LCDs") as well.[1] One such LCD provides that the number of allergy tests performed on individuals should be "judicious." It further provides that "[i]n order for allergy testing to be considered reasonable and necessary by Medicare, . . . [s]kin testing must be performed based on history and physical exam. . . ." The LCD requires that "[p]rior to performance of allergy testing, there must be evidence in the medical records that a history has been obtained, indicating the possible presence of allergy.

- This history should support that attempts to narrow the area of investigation were taken so that the minimal number of necessary skin tests might deliver a diagnosis.
- The history should support that the selection of antigens was based on the patient specific history and physician examination."

Local Coverage Determination (LCD): Allergy Testing (L36241), effective date October

1, 2015, *available at* https://tinyurl.com/LCDL36241 (last accessed April 16, 2019).

36. The LCD further provides that

[t]he number of tests performed should be judicious and dependent upon the history, physical findings and clinical judgment. All patients should not necessarily receive the same tests or the same number of sensitivity tests. Rather testing should be patient specific based on the history and physical examination. These tests are injection of small amounts of antigen into the superficial layers of the skin. This is the preferred method for allergy testing.

*Id.*

---

[1] A Local Coverage Determination is a decision by the Medicare Administrative Contractor ("MAC") as to whether a given procedure, item or service will be covered by Medicare in that MAC's jurisdiction. At all times relevant herein, the MAC for New Jersey was Novitas Solutions.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

37. An additional LCD (L36402) that applies to Medicare Part A provides that

retesting with the same antigens should "rarely be necessary within a three-year period."

Furthermore,

> [t]he medical record must document the elements of the medical and
> immunologic history including but not limited to correlation of symptoms;
> occurrence of symptoms; exposure profile; documentation of allergic
> sensitization by accepted means and where attempts at avoidance have
> proven unsuccessful (or the impracticality of avoidance exists); and a copy
> of the sensitivity results; along with the physical examination. The history
> should support that attempts to narrow the area of investigation were taken
> so that the minimal number of necessary skin tests might deliver a
> diagnosis. Testing results need to justify the diagnosis and code on each
> claim form. The clinical condition that is claimed to justify this test must be
> clearly documented in the record. Note: A payable diagnosis alone does not
> support medical necessity of ANY service. The interpretation of the test
> results and how the results of the test will be used in the patient's plan of
> care for treatment and the management of the patient's medical condition(s)
> must be documented.
>
> Claims submitted without such evidence will be denied as not medically
> necessary. When the documentation does not meet the criteria for the
> service rendered or the documentation does not establish the medical
> necessity for the services, such services will be denied as not reasonable
> and necessary under Section 1862(a)(1) of the Social Security Act.

Local Coverage Determination (LCD): Allergy Testing (L36402), effective date March

18, 2016, *available at* https://tinyurl.com/1LCDL36402 (last accessed April 16, 2019).

38. In 1967 Congress created and the Department of Defense implemented the

Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"). 10

U.S.C. § 1071. CHAMPUS is a federally funded program to provide medical and dental

care to active military personnel, retired personnel, and dependents of both active and

retired personnel. *Id.*

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

39.     In 1995 the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R. §§ 199.4, 199.17(a). Both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE."

40.     The purpose of the TRICARE program is to improve healthcare services to beneficiaries by creating "managed care support contracts" to pay civilian health care providers who care for TRICARE beneficiaries. 32 C.F.R. § 199.17(a)(1). The Defense Health Agency ("DHA") oversees TRICARE.

41.     For claims to reimbursable by TRICARE, the services provided must be medically necessary and reasonable as CMS-1500 describes.

### Factual Background

42.     Relator is a former employee of FA CV and worked for FA CV for approximately three years.

43.     Relator worked as a medical technician at three different locations for FA CV during her employment.

44.     As part of her job duties, Relator helped to perform and administer medical testing including forms of pulmonary testing, allergy testing, and Videonystagmography (VNG) tests.

45.     Although Relator did not help to provide or administer other medical tests, FA CV staff also provided cardiovascular testing including echocardiograms and stress tests, and performed ultrasounds.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

**A.     Defendants Subjected Their Patients to Unnecessary Tests**

46.     FA CV requires that all of its new and existing patients submit to some form of the following medical tests: allergy, pulmonary, vertigo, cardiovascular, blood testing, and ultrasounds.

47.     These tests are ordered by Dr. El-Atat and/or Dr. Abdul-Sater prior to either of the physicians visiting with the patient or even reviewing the patient's medical records to determine which tests, if any, are medically appropriate.

48.     Because Dr. El-Atat and Dr. Abdul-Sater required all of their patients to receive the same battery of tests, regardless of medical necessity, the orders for testing are not individualized for each patient and serve little to no medical value.

49.     Prior to a patient appointment, FA CV office staff verifies that the patient has active insurance. If the patient has insurance coverage, whether it be private medical insurance or a form of public health insurance coverage such as Medicare or Medicaid, Dr. El-Atat and Abdul-Sater order medical testing for the patient. If the patient does not have insurance, testing is generally not ordered.

50.     During a patient's initial appointment at FA CV's clinics, whether it be for new or existing patients, patients covered by insurance were subjected to the tests described above.

51.     If the patient did not agree to the testing or objected to submitting to all of the tests, Dr. El-Atat required office staff to pressure the patient into agreeing to the testing. If the patient refused, Dr. El-Atat would pressure the patient himself or simply discharge the patient.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

52.     FA CV patients are not allowed to meet with either Dr. El-Atat or Dr. Abdul-Sater until they have been subjected to the unnecessary testing described herein.

53.     After meeting with either Dr. El-Atat or Dr. Abdul-Sater, the patient was scheduled for a follow-up appointment approximately two weeks later under the ruse of discussing the results of the tests that the patient had taken that day.

54.     At the follow-up appointment, generally no additional testing was performed. This follow-up appointment was used to discuss the patient's blood test results, but the other test results were not discussed unless the patient specifically asked.

55.     Although tests were not performed at the follow-up appointment, FA CV falsified the dates of service on medical claims indicating that tests were performed at both the initial appointment and the follow-up appointment. For example, if six tests were performed at the initial visit, three of the tests would be billed using the first date of service and three tests would be billed as if they had been provided at the follow-up appointment.

56.     Upon information and belief, Defendants submitted fraudulent and falsified dates of service to increase the likelihood that the claims would be approved for reimbursement.

**B.      Defendants did not Review Patient Test Results**

57.     In addition to ordering tests without any medical reason for doing so, Dr. El-Atat and Dr. Abdul-Sater rarely reviewed any of their patient's test results.

58.     For example, Autonomic Nervous System (ANS) tests were administered and the results were sent to an email address belonging to Dr. El-Atat. Most, if not all FA

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

CV's employees had access to that email account. In the course of reviewing the inbox over multiple years, Relator and her colleagues realized that a vast majority of the test result emails were never opened and therefor, the test results were never reviewed.

59. If a patient were to ask for their results at the follow-up meeting, Dr. El-Atat and/or Dr. Abdul-Sater would ask FA CV staff to print those results because neither Dr. El-Atat nor Dr. Abdul-Sater had previously reviewed them.

60. Multiple patients told Relator that they never received their test results.

61. Multiple patients asked Relator and her colleagues why they were being subjected to medical testing every six months when the results were never shared with them.

62. To track its patients, FA CV uses a Google Document Excel spreadsheet. The spreadsheet includes personal health information including patient names, dates of birth, which tests were administered to the patient, on what date the tests were administered, and if the services and tests were submitted for reimbursement.

63. Once a test was performed, the FA CV employee administering the test was required to update the spreadsheet indicating the test was provided on that date.

64. In addition to tracking which tests were performed via the Google Document Excel spreadsheet, a physical notebook was kept in the office that was updated to reflect which tests were provided to which patients on which dates.

65. Upon information and belief, FA CV used a third-party medical biller. The biller reviewed the spreadsheet prior to filling out and submitting claims to Medicare, Medicaid, and TRICARE.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

66.     Despite the tests having no value and being medically unnecessary, FA CV submitted reimbursement claims for all of the tests and certified on each claim that the services and tests were reasonable and necessary. In reliance on Defendants' certifications, the claims were approved, and Defendants received payment for these false and fraudulent claims.

## C.     FA CV Scheduled Existing and Former Patients for Unnecessary Office Visits So That Additional Testing Could Be Performed

67.     To track upcoming appointments, FA CV uses an online calendar. Dr. Abdul-Sater and Dr. El-Atat reviewed the calendar to ensure that each day was fully scheduled with appointments. If either noticed that some days were not fully scheduled with patients, they required FA CV staff to review old patient files to see who they could schedule for an appointment. The decision to schedule appointments like this was not based upon medical necessity. Rather, the appointments were setup solely so that additional testing could be performed, and an office visit could be billed. FA CV staff were instructed to tell these patients that the doctor would like to visit with them.

68.     An FA CV staff member located in the Montclair office was responsible for scheduling patient appointments after the patient had not sought treatment for six months. After six months elapsed since the patient was last in the office, the staff member (Christina) called the patient to schedule an additional appointment. These appointments were not made due to medical necessity but rather, the appointments were made so that additional testing and office visit claims could be submitted for reimbursement.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

**D.     FA CV Pressured Office Staff to Complete as Many Tests as Possible, Which Resulted in Incomplete Tests**

69.     In an effort to increase the number of tests that could be performed and subsequently be billed to Medicare, Medicaid, and TRICARE, FA CV pressured employees, including Relator, to conclude tests before they were completed. For example, Relator was told to terminate the VNG test in five minutes when a fully completed test would have taken approximately 20-30 minutes.

70.     Dr. El-Atat and Dr. Abdul-Sater pressured their staff to administer as many tests as possible, and threatened to reduce staff pay if an acceptable number of tests were not performed.

71.     Relator and the four other employees who had the same role were each required to perform 15-30 tests per day.

**E.     Examples of Unnecessary Tests**

72.     The VNG test is a clear example of testing that was not medically necessary. Relator administered this test and has personal knowledge of this test being ordered when it was not necessary. A VNG test is ordered when a person experiences dizziness, vertigo, and/ or imbalance. However, FA CV required that all new patients receive this test prior to the patient being treated or seen by a physician or other qualified provider and prior to determining if the patient needed this test. This test was routinely ordered for patients that did not have symptoms that would indicate the need for such a test.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

73.     The required allergy testing also was medically unnecessary. As the Medicare LCDs provide, the number of allergy tests performed on individuals should be "judicious." It further provides that "[i]n order for allergy testing to be considered reasonable and necessary by Medicare, . . . [s]kin testing must be performed based on history and physical exam. . . ." The LCD requires that "[p]rior to performance of allergy testing, there must be evidence in the medical records that a history has been obtained, indicating the possible presence of allergy."

74.     Despite these clear requirements, FA CV ordered the same allergy test panel for all of its patients without regard to necessity. Furthermore, patients were routinely retested within 6 and 12 months, in clear violation of LCD rules.

75.     Because these tests were ordered for all of patients and without regarding to medical necessity, any claims Defendants submitted for reimbursement that included the tests are not reimbursable. Medically unnecessary tests are not reimbursable by any of the government insurance programs referenced within this Complaint.

76.     Dr. El-Atat and Dr. Abdul-Sater ordered the same panel of allergy tests for their patients without reviewing the patients' medical histories and prior to a physical exam. There was no basis for ordering the tests and no basis for ordering the same allergy panel for all of their patients. These allergy tests were plainly unnecessary and failed to follow the LCD's requirements.

77.     Upon information and belief, FA CV submitted claims for reimbursement to the government health insurance programs for these medically unnecessary allergy tests.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

78.     Although Relator did not personally administer other tests, including ultrasounds, these tests were also unnecessary as all patients were required to take the tests before Dr. El-Atat and Dr. Abdul-Sater would visit with the patient or review the patient's medical records to determine what tests, if any, were necessary.

79.     Upon information and belief, FA CV submitted claims for reimbursement to the government health insurance programs for all of the types of medical testing referenced herein when the tests were not medically necessary or reasonable. When submitting their claims, Defendants certified that the services were reasonable and necessary. Despite knowing the testing was unnecessary, Defendants submitted claims to the government insurance programs, which claims were approved and paid.

### Count I (All Defendants) – Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

80.     Relator restates and incorporates each and every allegation above as if fully set forth herein.

81.     Relator seeks relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

82.     As set forth above, Defendants knowingly or acting with deliberate ignorance or with reckless disregard for the truth, presented, or caused to be presented, false and fraudulent claims for payment or approval when the services provided were not medically necessary or reasonable. As such, the claims were not reimbursable.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

83.     In reliance on Defendants' certifications that the claims were truthful and accurate, and the services provided were reasonable and necessary, the United States paid the claims and remitted payment to Defendants.

84.     By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial. Defendants are also liable for a civil penalty as required by law for each violation.

## Count II (All Defendants) – Violations of the Federal False Claims Act
## 31 U.S.C. § 3729(a)(1)(B)

85.     Relator restates and incorporates each and every allegation above as if fully set forth herein.

86.     In performing the acts described above, Defendants, individually through their own acts or the acts of their agents, servants, officers or employees, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).

87.     As set forth above, Defendants knowingly or acting in deliberate ignorance or in reckless disregard of the truth, made, used, and caused to be made and used, false records and statements material to a false or fraudulent claim in connection with the receipt of the United States' funds.

88.     Because of Defendants' conduct, the United States has been damaged, and continues to be damaged, in an amount to be determined at trial. Defendants are also liable for a civil penalty as required by law for each violation.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

### Count III (All Defendants) – Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

89.　　Relator restates and incorporates each and every allegation above as if fully set forth herein.

90.　　In performing the acts described above, Defendants, individually through their own acts or the acts of their agents, servants, officers or employees, knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States in violation of 31 U.S.C. § 3729(a)(l)(G).

91.　　Defendants were paid money by the United States that they knew they were not entitled to receive. Despite having knowledge that they were overpaid by the United States, Defendants have retained all of the overpayments.

92.　　Defendants have an obligation to return such overpayments to the United States, and such failure to return the overpayments is a violation of 31 U.S.C. § 3729(a)(l)(G).

93.　　Defendants' failure to refund the known overpayments caused by their false claims constitutes a separate, continuing violation of the False Claims Act.

### Count IV: Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(C)

94.　　Relator restates and incorporates each and every allegation above as if fully set forth herein.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

95.    Pursuant to 31 U.S.C. § 3729(a)(1)(C), any person who conspires to commit a violation of the False Claims Act, including 31 U.S.C. §§ 3729(a)(1)(A), (B), or (G), is also liable to the United States.

96.    Defendants conspired to present and/or caused to be presented false and/or fraudulent claims for approval; conspired to make, use, or cause to be made or used false records or statements material to false or fraudulent claims; and conspired to make, use, or cause to be made or used false records or statements material to an obligation to pay or transmit money or property to the Government, or to conceal, improperly avoid, or decrease an obligation to pay or transmit money or property to the Government.

97.    The conspiracy is such that, in part, Defendants ordered medically unnecessary testing for its patients and certified that the tests were reasonable and necessary when they submitted claims for reimbursement.

98.    As a result of Defendants' conspiracy, the United States has been damaged, and continues to be damaged, in an amount to be determined at trial. Defendants are also liable for a civil penalty as required by law for each violation.

### Count V (All Defendants) – Violations of the New Jersey False Claims Act
### N.J.S.A. 2A:32C-3(a)

99.    Relator restates and incorporates each and every allegation above as if fully set forth herein.

100.    In performing the acts described above, Defendants, individually through their own acts or the acts of their agents, servants, officers and employees, knowingly

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

presented or caused to be presented false or fraudulent claims for payment or approval by New Jersey Medicaid, in violation of N.J.S.A. 2A:32C-3(a).

101.   In reliance on Defendants' claim submissions and representations that the claims were for services that were reasonable and necessary, the State of New Jersey paid Defendants monies that they knew they were not entitled to receive.

102.   The State of New Jersey has been damaged, and continues to be damaged, in an amount to be determined at trial. Defendants are also liable for a civil penalty as required by law for each violation.

### Count VI (All Defendants) – Violations of the New Jersey False Claims Act
### N.J.S.A. 2A:32C-3(b)

103.   Relator restates and incorporates each and every allegation above as if fully set forth herein.

104.   In performing the acts described above, Defendants, individually through their own acts or the acts of their agents, servants, officers and employees, knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved by the State, in violation of N.J.S.A. 2A:32C-3(b).

105.   The State of New Jersey has been damaged, and continues to be damaged, in an amount to be determined at trial. Defendants are also liable for a civil penalty as required by law for each violation.

### Count VII (All Defendants) – Violations of the New Jersey False Claims Act
### N.J.S.A. 2A:32C-3(g)

106.   Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

107.    In performing the acts described above, Defendants, individually through their own acts or the acts of their agents, servants, officers and employees, made, used, or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of New Jersey, in violation of N.J.S.A. 2A:32C-3(g).

108.    Defendants were paid money by the State of New Jersey that they knew they were not entitled to receive. Despite having knowledge that they were overpaid by the State of New Jersey, Defendants have retained all of the overpayments.

109.    Defendants have an obligation to return such overpayments to the State of New Jersey, and such failure to return the overpayments is a violation of N.J.S.A. 2A:32C-3(g).

110.    Defendants' failure to refund the known overpayments caused by their false claims constitutes a separate, continuing violation of the NJFCA.

## Count VIII (All Defendants) – Unjust Enrichment

111.    Relator restates and incorporates each and every allegation above as if fully set forth herein.

112.    As set forth above, the United States and New Jersey issued payments to Defendants based on Defendants' claims submitted using false and fraudulent records and false certifications.

113.    The circumstances of Defendants' receipt of these monies from the United States and New Jersey, in amounts to be determined at trial, are such that, in equity and good conscience, Defendants should not be permitted to retain such monies.

Page 24 of 27

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

114. By reason of Defendants' unjust enrichment, Relator respectfully requests

an order requiring Defendants to disgorge all monies they received as a result of the illicit

scheme described herein.

## Prayer for Relief

WHEREFORE Relator, on behalf of the United States of America and the State of

New Jersey, respectfully prays that judgment be entered in its favor against Defendants as

follows:

A. An order enjoining Defendants from further violations of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* and the New Jersey False Claims Act, N.J.S.A. 2A:32C-1, *et seq.*

B. Treble the amount of damages sustained by the United States and State of New Jersey because of Defendants' actions, and civil penalties and the costs of this action, with interest, including the costs to the United States, State of New Jersey, Relator, and Relator's counsel for their expenses related to this action;

C. All expenses and attorneys' fees incurred by Relator in this action, as provided by law; and

D. Any other equitable relief this Court deems just and proper.

Dated: April 17, 2019

### Lead Counsel:

Brian H. Mahany (WI Bar: 1065623)
**Mahany Law**
*pro hac vice* application forthcoming
P.O. Box 511328
Milwaukee WI 53203
T: (414) 258-2375
F: (414) 777-0776
brian@mahanylaw.com

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**Local Counsel:**

*/s/ Jason T. Brown*
Jason T. Brown (JB6579)
**Brown, LLC**
111 Town Square Place, Suite 400
Jersey City, NJ 07310
T: (877) 561-0000
F: (855) 582-5297
jtb@jtblawgroup.com

ATTORNEYS FOR PLAINTIFF-RELATOR

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**Certificate of Service**

I hereby certify that on April 17, 2019, I caused a true copy of the Complaint in

the matter captioned *United States and State of New Jersey ex rel. Jennifer Jean v. FA CV*

*Consultants PC, Fadi El-Atat, and Sarah Abdul-Sater* to be served upon the following,

along with written disclosure of substantially all material evidence and information

possessed by Relator:

*by hand delivery to*

Charles Grabow, AUSA
US Attorney's Office
District of New Jersey
970 Broad Street, 7th Floor
Newark, NJ 07102

*and by USPS Registered Mail, Return Receipt Requested, to*

Lauren Aranguren, Deputy Attorney General
N.J. Medicaid Fraud Control Unit
Office of the Insurance Fraud Prosecutor
P.O. Box 094
Trenton, New Jersey 08625-0094

Office of the Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

                                        /s/ Benjamin Lin
                                        Benjamin Lin